**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| GAIL MAJORS, ) | |
| ) | |
|       Plaintiff, ) | |
| ) | |
|         v. ) | **CIVIL ACTION** |
| ) | **NO. 12-40166-TSH** |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security ) | |
| Administration, ) | |
| ) | |
|       Defendant. ) | |
| _____ ) | |

**MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR ORDER**
**REVERSING DECISION OF COMMISSIONER (Docket No. 15) AND DEFENDANT'S**
**MOTION FOR ORDER AFFIRMING DECISION OF COMMISSIONER (Docket No. 22)**
**February 7, 2014**

HILLMAN, D.J.

      This is an action for judicial review of a final decision by the Commissioner of the Social

Security Administration (the "Commissioner") denying Gail Major's ("Plaintiff") application for

Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI"). Plaintiff filed a motion seeking an order reversing the decision of the Commissioner

(Docket No. 15), and the Commissioner filed a cross-motion seeking an order affirming the

decision of the Commissioner (Docket No. 22). For the reasons set forth below Plaintiff's motion

is granted, and the Commissioner's motion is denied.

Procedural History

      Plaintiff filed an application for DIB and SSI in April 2009 claiming she had been

disabled since June 1, 2005, the alleged onset date ("AOD").  (R. 19, 86-102).[1]  Plaintiff claimed

to be unable to work due to fibromyalgia, asthma, depression, and vertigo.  (R. 199).  Plaintiff's

claim was denied in October 2009 and then again upon reconsideration in April 2010.  (R. 107-

112, 113-118).  In June 2010 Plaintiff requested a hearing before an Administrative Law Judge

("ALJ").  (R. 119).  An ALJ held a hearing on November 29, 2011 where Plaintiff and a

vocational expert ("VE") testified.  (R. 31-64).  On December 8, 2011 the ALJ issued a decision

finding Plaintiff was not disabled under the Social Security Act.  (R. 16-27).  The Appeals

Council denied Plaintiff's request for review on November 21, 2012, making the ALJ's decision

the final decision of the Commissioner.  (R. 1-5).

<u>Facts</u>

*Personal and Employment History*

Plaintiff was born on August 7, 1965, making her 39 years old on her AOD and 46 years

old on the date of her hearing before the ALJ.  (R. 31, 194).  Her highest grade of school

completed was obtaining her GED.  (R. 204).  Plaintiff previously worked as a driver for a

vending company and as a foster parent.  (R. 200).

*Medical History*

1.   Physical Impairments

In November 2004, Plaintiff reported having left shoulder and neck pain for years, and

that the pain increased when she started working for a vending company.  (R. 499).  In July

2005, Plaintiff underwent the following procedures: left shoulder arthroscopy, labral

debridement, subacromial decompression, and left carpal tunnel release.  (R. 484).  Afterwards,

Plaintiff entered physical therapy, from which she was discharged with a good prognosis in June

2006.  (R. 482).  In October 2006, Plaintiff sought emergency care complaining of chest pain.

---

[1] A copy of the Administrative Record ("R.") has been provided to the Court under seal (Docket No. 11).

(R. 432).  She was discharged with a diagnosis of acute asthmatic bronchitis.  (R. 434).

In January 2007, Plaintiff saw Dr. Chris Lutrzykowski, M.D. with complaints of right arm pain that had lasted for two months.  (R. 574).  Plaintiff explained that she worked in a thrift shop and constantly used her right arm.  (R. 574).  Plaintiff reported she was otherwise doing well, with no other medical problems.  (R. 574).  Later that month, Plaintiff sought treatment for epigastric pain.  (R. 425-26).  Plaintiff was diagnosed with pancreatitis, probably colitis, and a urinary tract infection.  (R. 415).  Plaintiff told one of her doctors that she planned to open her own thrift shop in March.  (R. 414).  In February 2007, Plaintiff complained of elbow pain, and had an EMG study which was normal.  (R. 396-96).  In May 2007, Plaintiff began physical therapy due to complaints of hip pain and reported she was working part time.  (R. 368-69).  In August 2007 Plaintiff complained of chronic fatigue and weight gain.  (R. 391).  In September 2007, Plaintiff had x-rays taken of her hip and pelvis and of her lumbar area, all of which were normal.  (R. 390).  Also in September 2007, Plaintiff sought treatment for epigastric and abdominal pain and was scheduled for a cholecystectomy, or gall bladder removal surgery, the following week.  (R, 381, 267).   Plaintiff told her surgeon, Dr. Mitchell Cahan, M.D., that she had been doing well since her hospitalization for pancreatitis in February, but that she was never quite fully cured.  (R. 548).  She also said that she had good exercise tolerance, though she had smoked for 20 years, and that she was not limited in any way.  (R. 548).  In October 2007, Plaintiff sought treatment for pain in her shoulder, hip, and arm.  (R. 443).

MRI results from April 2008 showed that Plaintiff had mild degenerative disc and joint disease of the lumbar spine, focal moderate left paramedian disc protrusion at the L5-S1 deforming thecal sac, and impinging on the emerging right S1 nerve root.  (R. 347-48).  In May 2008, Plaintiff told Dr. George Lewinnek, M.D., that she had pain in her lower back and right leg

that came on gradually before Christmas without injury.  (R. 534).  Dr. Lewinnek noted that

Plaintiff worked in daycare with considerable difficulty.  (R. 534).  Dr. Charmaine Pastrano,

M.D., noted in July 2008 that Plaintiff continued to have lower back pain with S1 nerve

impingement, and in November 2008 that Plaintiff's back pain was relieved by water exercises in

the pool, but that Plaintiff could not maintain her pool membership due to financial issues.  (R.

532, 533).  In December 2008, Plaintiff sought emergency care for chest pain due to a chest

contusion.  (R. 336-39).  Also in December 2008, Plaintiff was treated for bronchitis and again

complained of lower back pain, though Dr. Pastrano noted Vicodin had greatly improved the

pain issue.  (R. 531).

 In February 2009, Plaintiff saw Dr. David Mazin, M.D., for right sided buttock and leg

pain.  (R. 265).  Dr. Mazin noted that Plaintiff reported feeling pretty good overall with only

mild pain.  (R. 265).  Plaintiff also told Dr. Mazin that she had been doing swimming exercises

which benefited her tremendously.  (R. 265).  Dr. Mazin found Plaintiff to be essentially pain

free with only mild aches from time to time and did not believe additional treatment was

necessary.  (R. 266).  The same month, Plaintiff told Dr. Pastrano that when taking Vicodin her

pain was reduced and she could do "all her daily activities."  (R. 529).  In March 2009, Plaintiff

told Dr. Pastrano that she had quit swimming for financial reasons, but her leg pain had not

returned.  (R. 529).  Dr. Pastrano recommended Plaintiff resume the water aerobics for her

chronic back pain.  (R. 529).  In June 2009, Plaintiff told Dr. Pastrano that she was having a hard

time dealing with the loss of her mother.  (R. 527).  She also reported that she was walking

everywhere, though this was a chore for her, had lost weight, and was experiencing foot pain.

(R. 527).  In July 2009, Plaintiff saw a podiatrist who diagnosed her with plantar fasciitis.  (R.

526).  Plaintiff saw Dr. Pastrano in October 2009 complaining of dizziness, headaches, and

abdominal pain.  (R. 525).  Dr. Pastrano examined Plaintiff and found she had very tight lumbar

muscles, but good flexion, extension, and side-to-side bending.  (R. 525).

In October 2009, Plaintiff had a disability physical examination with Ronald S. Jolda,

D.O.  (R. 313-17).  Plaintiff reported her primary problems were depression and fibromyalgia,

and also that she had asthma and experienced vertigo.  (R. 313).  Plaintiff reported her

fibromyalgia began in 2006, was diagnosed in 2008, and caused her to hurt all over.  (R. 313).

Dr. Jolda noted that Plaintiff did not appear to be in pain, but that she said everything he touched

was tender.  (R. 314).  Plaintiff appeared oriented to person, place, and time and had normal

concentration.  (R. 314).  Gait was normal, Plaintiff moved around without difficulty, and

Plaintiff could put full weight on each leg.  (R. 314).  Plaintiff said that following Dr. Jolda's

light made her feel dizzy.  (R. 314).  Dr. Jolda saw no nystagmus.  (R. 314).  Plaintiff was

limited in her neck flexion and extension and there was mild cervical muscle spasm.  (R. 315).

Lumbar extension and flexion were normal and there was no lumbar muscle spasm.  (R. 315).

Hands, arms, legs, and feet were all normal except for mild tenderness of the plantar fascia of

each foot.  (R. 316).  Dr. Jolda assessed Plaintiff to have chronic pain syndrome.  (R. 316).

Dr. Ludmila Perel, M.D., reviewed Plaintiff's records in October 2009 and provided a

Physical RFC Assessment.  (R. 318-325).  Dr. Perel noted that Plaintiff had fibromyalgia and

neck/back, hip, and elbow pain, and that Plaintiff's MRI showed mild degenerative disc disease

of the lumbar spine.  (R. 319).  Dr. Perel found that Plaintiff could occasionally lift 20 pounds

and frequently lift 10, could stand or walk for six hours in an eight hour workday, and could sit

for six hours in an eight hour work day.  (R. 319).  Dr. Peral also reported that Plaintiff should

avoid concentrated exposure to extreme cold and to fume, odors, dusts, gases, poor ventilation,

etc.  (R. 322).

In January 2010, Plaintiff presented Dr. Pastrano with disability paperwork and reported that her back pain and leg pain had worsened. (R. 523). Plaintiff said she could only walk about a block before she needed to rest and could only stand for about 10 minutes before she needed to sit. (R. 523). She also reported that she could only carry about 20 pounds and had limited range of motion of her back. (R. 523). When Dr. Pastrano asked Plaintiff about depression, Plaintiff responded that she felt sad most of the time, but had yet to establish care with a therapist and had not taken Zoloft or Celexa for several years. (R. 523). In February 2010, Plaintiff told Dr. Marzin that her back and leg pain had returned and that she was no longer swimming because she could not afford the membership. (R. 263). She also said her pain worsened when she sat for long periods of time. (R. 263). Dr. Mazin recommended steroid injections. (R. 263). That same month Plaintiff told Dr. Pastrano that she had recently taken in three kids for daycare, which was keeping her busy. (R. 624). Plaintiff also reported good pain relief with Vicodin. (R. 624).

In April 2010, Plaintiff told Dr. Pastrano she had increased shortness of breath with coughing and left elbow pain. (R. 623). Plaintiff also said that she continued to have pain in her back, but that walking regularly helped somewhat with the pain. (R. 623). Plaintiff reported that she was babysitting for children under the age of five. (R. 623).

Also in April 2010, Dr. Elaine Hom, M.D., reviewed the evidence in Plaintiff's file and affirmed Dr. Perel's assessment from October 2009. (R. 586).

In May 2010, Dr, John Herbert Stevenson, M.D., reported that Plaintiff's left elbow pain had not improved as a result of a corticosteroid injection. (R. 621). In August 2010, Plaintiff told Dr. Pastrano that she continued to have difficulty standing, sitting, or walking, with a limit of 10 to 15 minutes before she experienced discomfort. (R. 615). Plaintiff also said that she had

joined a gym with a pool and felt better after exercise.  (R. 615).  In November 2010, Plaintiff

was being treated for pneumonia.  (R. 611).  Plaintiff reported working at a daycare and said that

many of the children there were sick.  (R. 611).

By January 2011, Plaintiff had gotten better from her previous episode of pneumonia, but

was again starting to show signs of either bronchitis or pneumonia.  (R. 608).  In March 2011,

Dr. Pastrano noted that Plaintiff continued to have a moderate, persistent cough.  (R. 603).  In

May 2011, Plaintiff complained of shortness of breath and a cough.  (R. 602).  In June 2011,

Plaintiff followed up with Dr. Pastrano on her chronic pain issues.  (R. 600).  Plaintiff reported

that her pain had not been well controlled on Vicodin, but that she kept active by taking care of

her grandchildren, ages two to eleven, and still did housework.  (R. 600).  In July 2011, Dr.

Pastrano noted that Plaintiff had been doing ok and controlling her symptoms until a few months

before when she started to feel too tired to do daily activities like take care of her grandchildren

and operate her daycare.  (R. 593).  Plaintiff denied any depression.  (R. 593).  In September

2011, Plaintiff told Dr. Pastrano that her back pain was getting more intense and that she did not

have time to exercise anymore.  (R. 591).  Plaintiff also reported that she was taking care of

several children from 6 am to 10 pm.  (R. 591).

2.  Mental Impairments

In August 2009, Plaintiff saw psychologist Mark Brooks, Ph.D., for a consultative

psychological evaluation.  (R. 292-97).  Plaintiff reported that she had not worked in four years

due to her physical problems, which she said consisted of fibromyalgia, asthma, and vertigo.  (R.

292).   Plaintiff said she had taken antidepressants for pain, had no mental health issues, and was

seeking DIB based solely on her physical problems.  (R. 293).  Plaintiff did report recent

symptoms of depressions which were complicated by the death of her mother.  (R. 293).

Plaintiff said she had been experiencing a sad affect, insomnia, low energy, and fatigue for the past year.  (R. 293).  Plaintiff did not articulate that her depressive symptoms were specifically interfering with her ability to work.  (R. 294).  Plaintiff reported being independent for activities of daily living, though noted that her ability to attend, concentrate, and complete tasks and to carry out and remember instructions fluctuated with her pain level.  (R. 294).  Dr. Brooks assessed Plaintiff's global functioning at 65.  (R. 294).[2]

In September 2009, psychologist Peter Robbins, Ph.D., reviewed Plaintiff's records.  (R. 298-310).  Dr. Robbins concluded that Plaintiff had an affective disorder that was not severe and caused only mild limitations.  (R. 398, 308, 310).  In April 2010, Brian O'Sullivan, Ph.D., reviewed the evidence in Plaintiff's file and affirmed Dr. Robbins' assessment.  (R. 587).

In October 2011, Plaintiff told Dr. Pastrano that she was having worsening episodes of panic attacks due to stress at home.  (R. 590).  Plaintiff also complained of memory problems that had worsened over the previous few months, though she noted that there were no incidents of leaving children or leaving the stove on.  (R. 590).

*The ALJ's Findings*

To be found eligible for DIB and SSI, an applicant must prove that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423 (d)(1)(A).  When determining whether an applicant meets this standard, the Commissioner uses a "five-step sequential evaluation process."  20 C.F.R. § 404.1520 (a)(4).  This process requires the

---

[2] A Global Assessment of Functioning ("GAF") score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. Diagnostic and Statistical Manual of Mental Disorders (Am. Psychiatric Ass'n, 4th ed., 2000) at 34.

Commissioner to decide (1) whether the applicant is engaged is substantial gainful activity; if not (2) whether the applicant has a severe medical impairment; if so (3) whether the impairment meets or equals one of the listings in the Listing of Impairments, 20 C.F.R. § 404, subpart P, Appendix 1; if not (4) whether the applicants Residual Functional Capacity ("RFC") allows her to perform her past relevant work; and, if not (5) whether, considering the applicant's RFC, age, education, and work experience, the applicant could make an adjustment to other work. *Id*. Any jobs that an applicant could adjust to must exist in significant numbers in the national economy. 20 C.F.R. § 404.1560.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her AOD. (R. 21). At step two, the ALJ found Plaintiff had the following severe impairments: fibromyalgia, asthma, and depression. (R. 21). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P. (R. 21). At step four, the ALJ found Plaintiff was unable to perform any past relevant work. (R. 26). The ALJ determined Plaintiff had the RFC to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she would need the option to sit or stand at will, could only occasionally push and pull with her upper and lower extremities, could occasionally climb, balance, and stoop, could not kneel, crouch, or crawl, could occasionally perform reaching but never overhead reaching, could not be exposed to temperature extremes, fumes, or hazards such as unprotected heights and dangerous moving machinery, could not perform rate production work, and could do a job that does not require contact with the general public. (R. 22). The ALJ found the Plaintiff was 39 years old on the AOD, which is defined as a younger individual, has at least a high school education, and can communicate in English. (R. 26). In light of these factors and Plaintiff's

RFC, at step five the ALJ found Plaintiff could perform jobs that exist in significant numbers in the national economy, and therefore was not disabled from the AOD through the date of the ALJ's decision.  (R. 26-27).

In making this determination, the ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, and that Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were somewhat credible, but not to the extent alleged.  (R. 25).  The ALJ found Plaintiff's allegations of sever, disabling pain were inconsistent with her mild exam findings and wide range of daily activities. The ALJ also noted that medical records indicate Plaintiff's asthma is mild and well controlled, and that Plaintiff had not receive psychiatric treatment for a year and a half and did not receive psychiatric medication from her doctor, though she had in the past.  (R. 25).  The ALJ found the RFC assessments completed by the State Disability Determination Services (DDS) useful and informative, but he did not adopt them in full because they were completed by physicians who did not examine Plaintiff, and because additional medical records had been admitted since the DDS opinions were issued.

<u>Discussion</u>

Plaintiff argues the Commissioners' decision should be reversed because the ALJ erred in failing to consider Plaintiff's subjective complaints, the ALJ failed to recognize Plaintiff's spinal impairment, and the ALJ failed to meet her burden on proof at step five of the evaluation.

*Standard of Review*

Review by this Court is limited to whether the Commissioner's findings are supported by substantial evidence and whether he applied the correct legal standards.  *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996); *see also Rodriguez v. Sec'y of Health*

& *Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When applying the substantial evidence standard, the court must bear in mind that it is the province of the Commissioner to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts about the evidence. *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). Reversal of an ALJ's decision by this court is warranted only if the ALJ made a legal error in deciding the claim, or if the record contains no "evidence rationally adequate . . . to justify the conclusion" of the ALJ. *Roman-Roman v. Comm'r of Social Security*, 114 F. App'x 410, 411 (1st Cir. 2004); *see also Manso-Pizzaro*, 76 F.3d at 16. If the Commissioner's decision is supported by substantial evidence, it must be upheld even if the record could arguably support a different conclusion. *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987).

*Whether the ALJ Properly Considered Plaintiff's Subjective Complaints*

Plaintiff argues the ALJ erred by failing to properly consider Plaintiff's subjective complaints, and that this resulted in a flawed RFC. The ALJ determined the Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms alleged by the Plaintiff, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not fully credible.

When a claimant's statements about subjective pain are "not inconsistent with the objective findings, they could, if found credible by the adjudicator, permit a finding of disability where medical findings alone would not" and should be part of the calculus. *Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 21 (1st Cir. 1986). The adjudicator "must give full consideration to all of the available evidence, medical and other, that reflects on the impairment

and any attendant limitations of function" and then give a rationale for his finding, including an analysis of the evidence and a resolution of inconsistencies in the evidence. *Avery*, 797 F.2d at 29.[3]

Here, the adjudicator did not find Plaintiff's statements about subjective pain fully credible. The ALJ explained that Plaintiff's statements concerning her pain were somewhat credible, but not to the extent alleged, in light of her mild exam findings, wide range of daily activities, and treatment history. For example, the ALJ explained that an allegation of severe, disabling pain is inconsistent with an assertion that Plaintiff can do daily chores and watch young children four days a week. That Plaintiff continued to perform these activities is documented in her initial SSA report and many of Plaintiff's medical records. Plaintiff's medical records consistently report that she was performing daily activities and took care of several children during the week. Plaintiff also testified at her hearing that she continued to do some chores and watch small children. Additionally, the ALJ explained that Plaintiff's medical records show her asthma is mild and controlled and that Plaintiff has neither had psychiatric care nor been on psychiatric medication for a year and a half. The ALJ also noted that no treating or examining physician has suggested Plaintiff is more limited than the RFC does. The ALJ's consideration and discussion of these factors is sufficient to meet the requirements under *Avery* and is supported by the record.

Issues of credibility are the province of the ALJ, not this Court. *Irlanda Ortiz*, 955 F.2d at 769 ("It is the responsibility of the Secretary to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the evidence is for the

---

[3] Some of the factors to be considered, if relevant, are: (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities. *Avery*, 797 F.2d at 28-29; see also SSR 96-7P, 1996 WL 374186, *3.

Secretary, not the courts."). The ALJ's credibility finding was adequately explained and based on substantial evidence on the record. As such, it will not be disturbed, and the ALJ's determination will not be overturned on this ground.

*Whether the ALJ Failed to Recognize Plaintiff's Spinal Impairments*

Plaintiff next argues that the ALJ erred in failing to recognize Plaintiff's spinal impairment as a severe impairment at step two of the sequential analysis. In this case any error at step two was harmless because the evaluation proceeded past step two and the ALJ considered all of Plaintiff's impairments at step four. *Noel v. Astrue*, 2012 WL 2862141 (D. Mass. 2012) ("Even if the ALJ did err in his finding that Plaintiff's anxiety was not a severe impairment, that error was harmless. Because the ALJ found that Plaintiff had at least one severe impairment, the ALJ took into consideration all of Plaintiff's impairments, both severe and non-severe, when assessing his RFC"); 20 C.F.R. § 404.1545(a)(2).

The ALJ clearly considered Plaintiff's spinal issues when assessing her RFC. In the ALJ's discussion following her RFC determination, the ALJ noted that Plaintiff had a lumbar MRI that showed mild degenerative disc and joint disease of the lumbar spine, and that lumbar spine motion was full and pain free on examination. The ALJ also relied on the report of Dr. Perel who considered plaintiff's lumbar MRI. The ALJ noted that Plaintiff saw Dr. Mazin with reports of recurring back pain that worsened when Plaintiff sat too long, and that Dr. Mazin scheduled lumbar epidural injections. The RFC takes these issues into account, as it states Plaintiff needs the option to sit or stand at will and can only occasionally perform activities such as balancing and stooping and can never kneel, crouch, or crawl. The ALJ considered all of Plaintiff's impairments, including her spine issues, when assessing Plaintiff's RFC, therefore any error she

made by not including those spinal issues as a severe impairment at step two is harmless and not a reversible error.

*Whether the ALJ Met her Burden at Step Five*

Plaintiff's final argument is that the ALJ failed to meet her burden at step five because she presented a flawed hypothetical to the VE and that the VE's testimony was inadequate. In order for a VE's testimony to constitute substantial evidence, it "must be in response to a hypothetical that accurately describes the claimant's impairments." *Cohen v. Astrue*, 851 F. Supp. 2d 277, 284 (D. Mass. 2012); *see Arocho v. Secretary of Health & Human Servs.*, 670 F.2d 374, 375 (1st Cir.1982). Specifically, Plaintiff argues that the hypothetical was deficient because it did not include all of the limitations of the RFC and did not properly consider the limiting effects of pain.

Plaintiff first argues that the hypothetical presented to the VE was deficient because it did not include the following limitations of the RFC: the need for Plaintiff to avoid hazards, the need for Plaintiff to be able to sit or stand at will, and the inability of Plaintiff to perform rate production work. The first limitation was, in fact, mentioned in the hypothetical, with the ALJ including the phrase "Avoid temperature extremes, fumes, hazards…." (R. 61). The second was also included, though it was phrased slightly differently in the hypothetical than in the ALJ's RFC. In the hypothetical to the VE, the ALJ said Plaintiff needed a job where she could "sit for six hours, be able to stand at will option," while in the RFC, the ALJ said Plaintiff "needs the option to sit or stand at will." These are substantially similar and convey the same requirement; therefore the slight difference in language does not constitute a reversible error. *Greene v. Astrue*, 2012 WL 1248977 (D. Mass. 2012) ("An administrative law judge's failure to use in his RFC assessment the exact language of a posed hypothetical does not automatically render his

findings erroneous. Rather, the difference must be material in order to potentially constitute an error.").

The hearing transcript does not show that the ALJ mentioned rate production work in her hypothetical. The transcript states "no (inaudible)" at the likely place the rate production work limitation would have been mentioned.[4]  While it seems likely the ALJ did include the rate production limitation in her hypothetical to the VE, this Court cannot say definitively that she did so.  "[T]he hypothetical posed to a VE must accurately reflect the claimant's limitation in order for the VE's response to constitute substantial evidence sustaining the Secretary's burden at step five to identify alternate work the claimant can perform." *Torres v. Sec'y of Health & Human Servs.*, 976 F.2d 724, 1992 WL 235535, *6 (1st Cir. 1992); *see Arocho v. Sec'y of Health & Human Servs.*, 670 F.2d 374, 375 (1st Cir. 1982) ("in order for a vocational expert's answer to a hypothetical question to be relevant… the Administrative Law Judge must both clarify the outputs (deciding what testimony will be credited and resolving ambiguities), and accurately transmit the clarified output to the expert in the form of assumptions.").  While in some cases, a claimant's failure to raise this issue at the ALJ stage may bar her from raising it on appeal, where, as here, a claimant has multiple impairments causing multiple limitations, requiring a claimant to insure the hypothetical reflects all of those limitations is "unrealistic." *Torres*, 1992 WL 235535, *6.  As does not clearly reflect that the ALJ included the rate production limitation in her hypothetical to the VE, remand is required so a VE who is fully informed of Plaintiff's limitations can determine whether there are jobs she can perform.

Plaintiff also argues that the hypothetical was flawed because the ALJ did not include additional nonexertional limitations caused by Plaintiff's pain. As explained above, the ALJ's

---

[4] The "inaudible" comes right after the ALJ noted that Plaintiff must avoid hazards and right before the public contact limitation, which is the exact spot the rate production limitation appears in the RFC.

assessment of the extent of Plaintiff's pain and resultant limitations is substantially supported by the record; thus the ALJ did not err by failing to include any additional limitations beyond those in the RFC.

Finally, Plaintiff claims the VE testimony was inadequate because the ALJ failed to determine if the VE testimony was consistent with the Dictionary of Occupational Titles ("DOT"). Though Plaintiff was represented by counsel, and Plaintiff's counsel did take the opportunity to question the VE, the issue of providing specific DOT numbers or determining that these numbers were consistent with VE's testimony was not raised. Therefore the issue is deemed waived and will not be considered as a basis for reversal here. *Edwards v. Sec'y of Health & Human Servs*., 1994 WL 481140, at *3 (1st Cir. 1994) (applying "ordinary rule that appellate courts will not consider issues not raised below" where claimant did not object when VE assigned only general job titles and not DOT code numbers to his testimony); *Rock v. Astrue*, 2013 WL 1292669 (D. Mass. 2013) (finding that because failure to provide DOT codes at hearing "was not an issue raised at the hearing, where [claimant] was representing by counsel" the issue was deemed waived); *Marques v. Astrue*, 2012 WL 925710 (D. Mass. 2012) ("because Marques' attorney was given an opportunity to cross-examine the vocational expert and neglected to raise the objection, Marques is barred from raising" issue of ALJ failing "to identify and obtain a reasonable explanation for the conflict between the vocational expert's testimony and the Dictionary of Occupational Titles").

## Conclusion

For the foregoing reasons, Plaintiff's Motion for Order Reversing Decision of Commissioner is ***granted***, and the Commissioner's Motion for Order Affirming Decision of Commissioner is ***denied***. The case is remanded to the ALJ for further proceedings consistent

with this decision.[5]


SO ORDERED.

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**UNITED STATES DISTRICT JUDGE**

---

[5] This Court may affirm, modify or reverse the Commissioner's final decision, with or without remanding the case for rehearing.  42 U.S.C. § 405(g). "[O]rdinarily the court can order the agency to provide the relief it denied only in the unusual case in which the underlying facts and law are such that the agency has no discretion to act in any manner other than to award or to deny benefit."  *Seavey v. Barnhart*, 276 F.3d 1, 11 (1st Cir. 2001).  Where, as here, an essential factual issue has not been resolved and there is no clear entitlement to benefits, "the court must remand for further proceedings."  *Id*.